IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 3, 2018

**IN RE: SAVANNAH M.**

**Appeal from the Juvenile Court for Montgomery County**
**No. 17-JV-567       Tim Barnes, Judge**

_____

**No. M2018-00752-COA-R3-PT**

_____

This is a parental termination case. The trial court found that clear and convincing evidence existed to terminate mother and father's parental rights on the grounds of abandonment by conduct exhibiting wanton disregard and persistence of conditions. The trial court further found that termination was in the best interests of the child. On appeal, however, the Department of Children's Services did not defend the trial court's ruling as to the ground of abandonment. Although we accordingly reverse as to that ground, we affirm as to the ground of persistence of conditions and with respect to the trial court's determination that the termination of mother's and father's parental rights was in the child's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Kenneth W. Merriweather, Clarksville, Tennessee for the appellant, Teresa K.

William M. Johnson, Clarksville, Tennessee, for the appellant, Teresa Renaldo M.

Herbert H. Slattery, III, Attorney General and Reporter; Amber L. Seymour Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. BACKGROUND AND PROCEDURAL HISTORY

The child at issue in this case, S.L.M., was born on August 29, 2013 to Teresa K. ("Mother") and Renaldo M. ("Father").[1] For a number of years before the birth of S.L.M., both Mother and Father had been involved with the Department of Children's Services ("DCS") concerning other children of Mother's. A background on this involvement will aid in our analysis as to the current custodial episode regarding S.L.M.

Mother has five other children: R.M.M., born February 15, 2008; B.L.M., born January 21, 2009; B.N.K., born December 20, 2009; J.M.K., born January 29, 2011; and B.A.K., born March 17, 2012. Father is not the biological father of B.N.K. or J.M.K., and the record indicates that neither child lived with Mother and Father. From August 31, 2010 to December 19, 2011, the two oldest of S.L.M.'s biological siblings[2]—R.M.M. and B.L.M.—were in DCS custody due to environmental neglect and lack of supervision at Mother and Father's residence on Maple Street ("the Maple Street home"). Both siblings returned to Mother and Father's custody at the Maple Street home following a ninety-day trial home visit. However, DCS received more referrals in March 2012, and on May 21, 2012—one week after the birth of B.A.K.—the Montgomery County Juvenile Court ("the trial court") found S.L.M.'s three biological siblings to be dependent and neglected due to environmental neglect and lack of supervision at the Maple Street home. Thereafter, the three children were placed into DCS custody.

On September 18, 2013, less than a month after S.L.M. was born, DCS received a referral with allegations of environmental neglect and lack of supervision. In response, a permanency plan was developed on September 23, 2013. The plan noted that DCS has had an "intensive history" with the family, including past referrals of family incest, severe sexual, and physical abuse of a child, environmental neglect, and lack of supervision. Additionally, the plan required Mother and Father to ensure than S.L.M. did not have any contact with certain people, namely her maternal grandmother, Paula Ellis.[3] The plan also prohibited Mother and Father from owning or having any animals in the Maple Street home.[4]

---

[1] In cases involving minor children, it is this Court's policy to redact names sufficient to protect the children's identities.

[2] S.L.M.'s "biological siblings" refers to R.M.M., B.L.M., and B.A.K.—those children with whom S.L.M. shares the same mother and father.

[3] The record indicates that Ms. Ellis had been previously substantiated with DCS for physical and sexual abuse.

[4] The requirement that Mother and Father's home be animal-free is recurrent throughout their involvement with DCS. In a December 19, 2013 visitation order regarding S.L.M.'s siblings, Mother and Father were required to keep the home clean and uncluttered with no dogs on the premises. An October 7, 2014 permanency plan similarly required that Mother and Father maintain a stable, clean, and

On March 26, 2014, DCS received a referral with allegations of sexual abuse by Mother towards one of her daughters, B.N.K. Based on the outcome of its investigation, DCS determined that Father would ensure that he or another family member or friend—approved by DCS—would supervise Mother while around S.L.M. and her three biological siblings. In July 2014, S.L.M.'s three biological siblings began a trial home visit with Mother and Father at the Maple Street home; however, on August 29, 2014, the trial home placement was disrupted and the three siblings re-entered DCS custody after Father admitted that he had left the children unsupervised with Mother.[5] Because S.L.M. had not been part of the trial home placement, she remained at the Maple Street home with Mother and Father.

On November 19, 2014, DCS received a referral with allegations of lack of supervision as to S.L.M. DCS was notified that Donald Doss—who had not been approved by DCS—had been living with the family for the past three months at the Maple street home. At one point during that three-month period, Mr. Doss had been arrested following a domestic violence incident at the Maple Street home.[6] DCS conducted a follow-up visit two days later, during which Child Protective Services Agent Synthia Steele observed Julian Torres asleep on the couch. DCS again reiterated to Mother and Father that all persons residing in the Maple Street home needed to be cleared by DCS, to which Mother and Father indicated that they understood. They also indicated that they would come into the DCS office later that day to discuss the situation; however, they never showed up.

On December 11, 2014, Foster Care Worker Earnest Williams—who managed the foster care case concerning S.L.M.'s three biological siblings—went to the Maple Street home on a random home visit. Upon entering, Mr. Williams observed Mr. Torres—the same man observed by Ms. Steele the previous month—asleep on the couch. Upon further questioning, Mother admitted that Mr. Doss, too, was inside the residence in the upstairs shower. DCS convened a Child and Family Team Meeting to discuss safety placement options for S.L.M., but, when no viable option could be agreed upon, DCS determined that S.L.M. would enter DCS custody. Following a December 12, 2014 emergency protective custody order placing S.L.M. in DCS custody, a hearing was held and the trial court adjudicated S.L.M. dependent and neglected on July 23, 2015. S.L.M. has remained in foster care since the trial court's emergency protective custody order.

After S.L.M. was placed in DCS custody, Mother and Father continued to fail to comply with trial court orders and DCS instructions. In July 2015, during an unannounced home visit, Mr. Williams observed approximately four dogs, five cats, and

hazardous-free environment free of any animals and/or pests.

[5] Mother and Father never regained custody of R.M.M., B.L.M., or B.A.K, and, on February 2, 2016, the trial court terminated Mother and Father's parental rights as to the three siblings.

[6] On December 8, 2014, the trial court entered an order specifically restricting Mr. Doss from entering the Maple Street home.

one bird inside the Maple Street home. Mother had attempted to conceal one of the dogs by wrapping it in a blanket, but she later revealed the dog upon questioning by Mr. Williams. Mr. Williams also observed clutter in the front yard and offered to take it to the dump. Later that same year, in December 2015, Mr. Williams made another visit to the Maple Street home wherein he observed two dogs in the kitchen, two dogs in the bathroom, two dogs in the living room, multiple cats running around the house, and a new litter of kittens in a closet.

Mr. Williams made another home visit to the Maple Street home on December 1, 2016, only to discover that Mother and Father were out of town for a funeral and that Ms. Ellis—S.L.M.'s maternal grandmother—was staying there. Mr. Williams nevertheless conducted a walkthrough of the residence and again observed several cats roaming about the residence, dogs in the kitchen, bathroom, and living room, and a caged bird.[7] In the bathroom with the dogs, Mr. Williams also observed fecal matter on the floor and in the bathtub. In addition to the animals, Mr. Williams observed piles of clothes throughout the home, dirty dishes, and roaches in the bedrooms where dog and cat food had been scattered. When Mr. Williams contacted Mother and Father about the situation, Mother stated that the animals belonged to her brother and Ms. Ellis and that "they would be getting their animals soon, once they move out."

On January 15, 2017, Emily Weeks, an animal control officer, responded to a call that Mother had abandoned her dogs and had not been home for weeks. Ms. Weeks went to the Maple Street home and discovered that no one was home, but she did observe three dogs in the yard and heard another dog inside the house. When Ms. Weeks contacted Mother over the phone, Mother indicated that she had been staying with and taking care of Ms. Ellis and that she had been back to the Maple Street home every day to give the dogs food and water. On January 30, 2017, Ms. Weeks received another call, this time from a witness claiming to have seen Father and his then-girlfriend carry something wrapped in a blanket to a dumpster and then throw it away. Ms. Weeks investigated and found a deceased and very emaciated dog in the dumpster. The following day, five dogs were seized from inside the Maple Street home, three of which appeared emaciated. As a result of Ms. Weeks' investigation, Mother and Father were charged with animal cruelty for failure to provide food, water, care, or shelter, to which they both entered guilty pleas and received sentences of eleven months and twenty-nine days of supervised probation following a sixty-day sentence of incarceration.[8]

Mother and Father's probation officers also made visits to the Maple Street home during S.L.M.'s custody episode, and they made observations similar to those of Mr.

---

[7] In total, Mr. Williams estimated that there were twelve animals in the Maple Street home on his December 1, 2016 visit.

[8] Mother and Father's sentence of sixty days of incarceration was later modified to thirty weekends.

Williams. Angellette Warfield had been Mother's probation officer since December 2015, following a 2014 child abuse conviction for which Mother had received two years' probation. Ms. Warfield testified that Mother violated this probation twice. In June 2016, Ms. Warfield had made an unannounced visit to the Maple Street home. There, she observed several dogs and cats inside the residence, "roaches and ants running all over the place[,]" and trash outside the front and back of the residence. She also noted a strong odor coming from inside the residence.[9] Ms. Warfield also discovered that Ms. Ellis, a man named Billy, and a young child were in the home. Ms. Warfield visited the Maple Street home again in September 2016, wherein she again observed dogs inside and clothes piled outside the residence, and she noted that the odor from the previous visit was still present. This September 2016 visit to the Maple Street home resulted in Mother's first probation violation. Mother received her second probation violation in February 2017 after Ms. Warfield was alerted to the above-referenced animal cruelty charge.

Kimberly Turner, Father's probation officer, testified that she, too, together with Ms. Warfield, made monthly visits to the Maple Street home. According to Ms. Turner, during all of these visits, she observed trash outside the home. Like Ms. Warfield, Ms. Turner also noted the strong odor emanating from the residence. Ms. Turner, however, admitted the odor was so strong that she could not go inside.[10] As to Father's probation, Ms. Turner testified that he violated his probation in February 2017 due to the animal cruelty charge. Regarding Father's status at the time of trial, Ms. Turner testified that he was at risk of violating probation again due to his failure to attend the required victim impact and cognitive behavioral classes.

On April 5, 2017, DCS petitioned the trial court to terminate Mother and Father's parental rights to S.L.M., raising two grounds for termination: abandonment by conduct exhibiting a wanton disregard for S.L.M.'s welfare and persistence of conditions.

In September 2017, Mother and Father moved into a new residence together on Whitfield Road ("the Whitfield Road home"). According to Mother, they changed residences because their landlord at the Maple Street home would not maintain the

---

[9] At the trial court's request, Ms. Warfield specified as to the odor of the Maple Street home:

Like, you know, like, you use the bathroom and you didn't flush the toilet for a while. I know we all know what that smells like. So it was kind of a cross between that and then the dogs pooping and peeing in the house, and then the watery mold and – and it was – it was unlike any other smell. Like, at some point you would expect to open up the door and see a dead body sitting there molding and rotting, but you didn't.

According to Ms. Warfield, a couple of neighbors had even complained about the odor.

[10] The trial court pressed Ms. Turner to be more specific regarding the odor; she responded: "Dogs. Real bad."

premises. Mr. Williams conducted a visit in October 2017 at the Whitfield Road home. During that visit, he observed clothing outside the residence, boxes of food that had roaches crawling on it, mold on the ceiling, some type of dog or cat food on top of the washing machine, and dishes and other items strewn about the floor. He could not check one of the bedrooms because its doorway was barricaded with stacked boxes. When Mr. Williams discovered two cats inside the residence, Mother and Father stated that they were neighborhood cats.

On March 28, 2018, the trial court granted DCS' April 2017 petition and terminated Mother and Father's parental rights to S.L.M. on the grounds of abandonment and persistence of conditions, concluding that such termination was in the best interests of S.L.M.. Mother filed her notice of appeal on April 23, 2018. Father's appointed counsel notified the appellate court clerk, stating that Father chose not to pursue an appeal and that the trial court had granted counsel permission to withdraw on May 3, 2018. Father then filed a pro se notice of appeal on May 29, 2018.[11]

## II. ISSUES PRESENTED

There are two dispositive issues on appeal, which we restate as follows:

1. Whether there is clear and convincing evidence to support the termination of Mother's and Father's parental rights on the ground of persistence of conditions.
2. If so, whether there is clear and convincing evidence to support the trial court's determination that termination of Mother's and Father's parental rights is in S.L.M.'s best interests.

## III. STANDARD OF REVIEW

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (Tenn. 1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos.

---

[11] Father's notice of appeal was not timely filed and was not signed by the appellant or his counsel. However, Mother's timely notice of appeal brought the entire case before this Court. *See* Tenn. R. App. P. 13(a). On August 1, 2018, this Court entered an order stating that "[a]ny questions concerning whether the father is entitled to pursue an appeal are reserved pending appointment of counsel and may be addressed in the parties' briefs." In its brief on appeal, DCS noted that Father's notice of appeal was not included in the appellate record, but otherwise did not address the issue.

M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of a parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

### IV. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

As noted earlier, the trial court relied on two statutory grounds in terminating Mother's and Father's parental rights, leading to S.L.M.'s removal from the Maple Street home: (1) abandonment by conduct exhibiting a wanton disregard for S.L.M.'s welfare and (2) persistence of conditions. Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed the appellate courts to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Here, however, DCS does not defend the ground of abandonment by wanton disregard, conceding that the record does not support it. Accordingly, we will reverse the trial court's finding of abandonment by wanton disregard as a ground for termination of Mother's and Father's parental rights and review the remaining ground of persistence of conditions upon which the trial court relied to terminate their parental rights.

Parental rights may be terminated for persistence of conditions when the child has been removed from the home of the parent by order of a court for a period of six months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chance of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).[12] The purpose behind the persistence of conditions ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010). In *In re Mickia J.,* this Court held that, "as a threshold requirement for applicability of the ground of persistence of conditions in termination of parental rights cases, the child must not only have been adjudicated dependent and neglected, but he or she must also have been removed from the defendant parent's home." *In re Mickia J.*, No. E2016-00046-COA-R3-PT, 2016 WL 5210794, at *5 (Tenn. Ct. App. Sept. 19, 2016). Here, the trial court issued an emergency custody order on December 12, 2014, placing S.L.M. in DCS custody. This was followed by the trial court adjudicating S.L.M. dependent and neglected on July 23, 2015 due to environmental neglect and instability in the home.

In its order terminating Mother's and Father's parental rights, the trial court found, in relevant part, that

> [S.L.M.] was removed from the parents because of continued substantial environmental neglect in the home, including animals and fecal matter

---

[12] This statute was amended effective July 1, 2018, expanding its reach. *See* Tenn. Pub. Ch. 875, § 2. As amended, the persistence of conditions ground applies to situations in which the child "has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A). Because this change is substantive rather than procedural or remedial, the amended statute will not be applied retroactively to this case. *See In re Billy C.*, No. M2018-00463-COA-R3-PT, 2018 WL 5751991, at *10 n.6 (Tenn. Ct. App. Nov. 1, 2018).

being throughout the home, lack of supervision, and constant instability in the family home. Additionally the parents have repeatedly failed to comply with Court orders regarding appropriate persons living and/or staying in the home and animals in the home and have continued to engage in illegal activity while [S.L.M.] has been in custody.

Moreover, the trial court found that the conditions that led to S.L.M.'s removal still exist and that there is little chance that they will be remedied such that S.L.M. could be returned safely to the custody of Mother and Father. We agree.

Mother and Father have repeatedly shown that they are unable to maintain an appropriate home environment free from debris, clutter, animals, animal waste, and unsafe conditions. On nearly every visit to the Maple Street and Whitfield Road homes, DCS observed dogs, cats, and other animals inside the residences, despite numerous trial court orders prohibiting Mother and Father from doing so due to the constant concern of environmental neglect. During these visits, DCS also observed a significant amount of clutter and debris—trash and piles of clothes were often scattered throughout the residence and in the yard, dishes were frequently left unwashed in the sink, and roaches and ants would be seen "running all over the place." In fact, Mother and Father kept the Maple Street home in such a poor condition that Ms. Warfield commented that "you would expect to open up the door and see a dead body sitting there molding and rotting[.]"

Mother and Father have also shown an inability to keep persons not approved by DCS from entering their home, as required by the permanency plans and trial court orders. During visits to the Maple Street home in 2014, DCS discovered—twice—that Mr. Doss and Mr. Torres were inside the residence. Mr. Torres and Mr. Doss were never approved by DCS, and, moreover, a trial court order had specifically prohibited Mr. Doss from entering the Maple Street home. DCS also discovered on two separate occasions that Ms. Ellis—who had been substantiated with DCS for physical and sexual abuse—had been residing in the Maple Street home. We conclude that, if S.L.M. were to be returned to the custody of Mother and Father, she would be put at risk of further neglect and abuse due to their inability to abide by the requirements set forth in numerous permanency plans and trial court orders. Accordingly, the evidence clearly and convincingly establishes the elements necessary to terminate Mother's and Father's parental rights as to S.L.M. on the ground of persistence of conditions.

## V. BEST INTERESTS

Having concluded that there is a statutory ground for termination of Mother's and Father's parental rights, we must next consider whether termination of their parental rights is in S.L.M.'s best interests. As we explained previously, following a trial court's finding that at least one of the statutory grounds for termination of parental rights has

been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2). Once the court has determined that the parent is unfit based on clear and convincing evidence that one or more of the grounds for termination exists, the interests of the parent and child diverge, and the interests of the child become the court's paramount consideration. *In re Audrey S.*, 182 S.W.3d at 877. If the interests of the parent and the child conflict, the court must always resolve the conflict in favor of the rights and best interests of the child. Tenn. Code Ann. § 36-1-101(d). Tennessee Code Annotated section 36-1-113(i) sets forth the following list of factors to be considered when determining a child's best interests in a termination of parental rights case:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[13] In its order terminating Mother's and Father's parental rights, the trial court made numerous findings concerning S.L.M.'s best interests, as reproduced here in relevant part:

> The Court finds that the mother and father have not made the changes in their circumstances that would make it safe for the child to be placed in their care. Throughout this case, DCS has attempted to assist the parents to no avail and the parents have continued to engage in criminal activity, violate Court orders, and failed to maintain [a] safe and suitable home environment. Due to the child spending a significant portion of her life in foster care, there is no meaningful relationship between the parents and child . . . . The parents have shown a lack of interest in their child's welfare and have abandoned the child to the foster care system.
>
> It has been twenty-three months since the child was placed in DCS custody and the conditions that led to the removal still persist as to the mother and father. The parents have made minimal attempts to reunify with their child, instead choosing to engage in criminal activity and continually refusing to follow Court orders to ensure a safe and appropriate home for the child. The mother and father are currently unable to care for the child as they do not have appropriate housing . . . .
>
> The Court is significantly disturbed by the fact that the parents had a dog in their care that they starved to death along with numerous other dogs in their care that at the time animal control removed them from the parents were in various stages of starvation despite the Court's numerous orders restricting them from having animals in the home. Of note, when this child was removed from them, the child was diagnosed with failure to thrive which occurred while the child was in the parents' care. The Court believes that these parents are so irresponsible that the[y] starved a dog to death and that there is every indication that the same would occur if a child was left in their care. As such, the Court believes that reunification is not in the child's best interests, but would lead to a possibly dangerous situation for the child.
>
> The child is doing well and thriving in her foster home and changing caregivers at this time would not be in their best interests. The child has been in this foster home her entire custodial episode and views the foster mother as her "mom." The child came to the foster home with special needs, delayed development in speech and motor skills, and a diagnosis of

---

[13] This statute has been amended since the March 28, 2018 order; however, this particular provision remained unchanged.

- 11 -

failure to thrive. Since being in the home, the child has excelled, meeting all of her developmental goals, and growing and thriving appropriately. The Court could not think of a more appropriate placement than her current foster home.

After our review of the record and the relevant factors listed in Tennessee Code Annotated section 36-1-113(i), we agree with the findings of the trial court and conclude that there is clear and convincing evidence that termination of Mother's and Father's parental rights is in S.L.M.'s best interests. Mother and Father have not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in S.L.M.'s best interest to be returned to their current residence; similarly, based on their repeated conduct, the physical environment of their home is unhealthy and unsafe. Moreover, the record indicates that S.L.M. has improved physically and mentally ever since she was removed from the custody of Mother and Father in 2014. Anita Amos, S.L.M.'s resource parent, testified that when S.L.M. came to her at nearly sixteen months old, she was not walking yet and was considered a "failure to thrive" due to her small size. However, with the intervention of certain occupational and speech therapy services, S.L.M. is no longer considered a failure to thrive, and her speech has also improved. Accordingly, a change in caretakers and physical environment would have a negative effect on S.L.M.'s emotional, psychological, and medical conditions.

## VI. CONCLUSION

For the foregoing reasons, we conclude that clear and convincing evidence supports the termination of Mother's and Father's parental rights on the ground of persistence of conditions and that such termination is in S.L.M.'s best interests.

_____
ARNOLD B. GOLDIN, JUDGE